UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON RAISER, | Case No.: 19-cv-0751-GPC-KSC |
| Plaintiff, | |
| | **ORDER GRANTING SUMMARY** |
| v. | **JUDGMENT IN FAVOR OF** |
| | **DEFENDANTS** |
| SAN DIEGO COUNTY, et al., | |
| Defendants. | **[ECF Nos. 132, 133, 185, 186]** |

Before this Court are Motions for Summary Judgment, one collectively filed by the Defendants, and the other filed by Plaintiff, Mr. Aaron Raiser ("Plaintiff" or "Mr. Raiser") who is litigating *pro se*. ECF Nos. 132, 133. Upon consideration of the moving documents and the case record, the Court **GRANTS** Defendants' Motion for Summary Judgment, and **DENIES** Plaintiff's Motion for Summary Judgment.

## I. BACKGROUND

### A. Procedural History

Mr. Raiser filed the First Amended Complaint ("FAC") on July 9, 2019, which is the operative pleading in the instant matter. ECF No. 9. In general, the FAC alleged that Defendants—consisting of Defendant San Diego County and sheriff deputies of the

1

County who were initially unidentified—were liable for the following: (1) a violation of 42 U.S.C. § 1983 ("Section 1983") based on unreasonable search and seizure under the Fourth Amendment to the U.S. Constitution, (2) false imprisonment, and (3) the Tom Bane Civil Rights Act (the "Bane Act"). Upon expedited discovery that was limited to identifying the sheriff deputies, it was eventually revealed that the sheriff deputies at issue were Detectives Steven Fealy, Ryan Murphy, and Scott Rossall. Mr. Raiser served these Detectives. *See* ECF Nos. 34, 35, 48.

While discovery of the sheriff deputies' identities was ongoing, the Court granted San Diego County's Motion to Dismiss, ECF No. 12, which argued that San Diego County cannot be liable for any of the Section 1983 claims. *See* ECF No. 27. But after the Court dismissed Plaintiff's Section 1983 claims against San Diego County and permitted Plaintiff leave to file a second amended complaint, *see id.* at 14,[1] Mr. Raiser never amended the FAC. Accordingly, the remaining causes of action in the FAC are: (1) three independent Section 1983 claims against Detectives Fealy, Murphy, and Rossall (the remaining First to Third Causes of Action), (2) a false imprisonment claim against Detective Rossall and San Diego County (Fourth Cause of Action), and (3) a Bane Act claim against Detective Rossall and San Diego County (Fifth Cause of Action).

On February 16, 2021, the parties filed their respective Motions for Summary Judgment. *See* ECF Nos. 132, 133. After the Court granted multiple extension requests filed by Mr. Raiser, the parties eventually filed their corresponding Oppositions on April 16, 2021, ECF Nos. 164, 165, and their respective Reply briefs on April 30, 2021, ECF Nos. 167, 168.

/ / /

---

[1] References to specific page numbers in a document filed in this case correspond to the page numbers assigned by the Court's Electronic Case Filing ("ECF") system.

2

Mr. Raiser also *ex parte* moved to file a sur-reply, asserting that Defendants raised "new" arguments in their Reply briefs. *See, e.g.*, ECF Nos. 172, 177. In addition, Mr. Raiser amended the summary judgment documents, specifically moving to file a separate Evidentiary Objection and an Amended Response to Defendants' Statement of Undisputed Facts. *See* ECF Nos. 185, 186. Ultimately, the Court has reviewed and considered all of Mr. Raiser's documents in deciding the issues in this Order.

### B. Relevant Facts

At issue are three separate incidents Mr. Raiser experienced with different sheriff deputies. Mr. Raiser is homeless and lives out of his vehicle, a white 2015 Dodge Dart. *See* ECF No. 132-2 at 5, 13 (Dep. Mr. Raiser). During each incident, Mr. Raiser had parked his vehicle, and was approached by the Detectives who had never interacted with Mr. Raiser before. Whenever he interacts with the police, he attempts to record all of these interactions "to get an accurate representation of what happened." *Id.* at 7–8.

There were common observations about Mr. Raiser's vehicle that are worth noting upfront. First, during the three incidents that form the basis of his complaint, the back windows of the vehicle had been left down and mosquito screens were in place instead. *See id.* at 26–27, 54–55. Second, the inside of the vehicle was full of Mr. Raiser's "stuff." *See id.* at 56. Defendants have provided still-shots of body-worn camera footage, *see, e.g.*, ECF No. 132-2 at 88, one of which is depicted below:



### 1. The First Incident (Detective Fealy)

On April 29, 2017 at about 6:57 p.m., Mr. Raiser parked his car in a cul-de-sac situated to the side of a road near Fallbrook, California, near the exit for Mission Avenue off the I-15 Freeway. *See* ECF No. 132-2 at 22; ECF No. 164-1 at 2 (Plaintiff's Undisputed Material Facts and Defendants' Response Thereof ("Pl.'s UF") No. 1). The area is rural, with "no houses around per se." ECF No. 186-3 at 2 (Defendants' Undisputed Material Facts and Plaintiff's Amended Response Thereof ("Defs.' UF") No. 2). Near the area is a gate or fence (or as Mr. Raiser stated in deposition "like a gate, like an old farm gate"), beyond which lies private property. *See id.* at 2–3 (Defs.' UF Nos. 4, 7). During the deposition, Mr. Raiser described the area as "dilapidated" and "desolate," with "nobody around to bother." ECF No. 132-2 at 24. On the evening of the incident, no other cars were around within 100 yards of that area. *See id.* at 26.

Detective Fealy has been a law enforcement officer for San Diego County for nearly 5 years. ECF No. 132-2 at 59. He was on patrol in Fallbrook, California on the day at issue. *See* ECF No. 186-3 at 3 (Defs.' UF No. 6). And at approximately 6:57 p.m. during his patrol, Detective Fealy saw Mr. Raiser and Mr. Raiser's vehicle in the location discussed above. *See id.* (Defs.' UF No. 7). Data from the California Law Enforcement Telecommunications System ("CLETS"), presented by Mr. Raiser, indicates that Detective Fealy ran a vehicle/license plate check at 6:57 p.m. *See* ECF No. 180 at 13.

As stated in his Declaration, Detective Fealy found Mr. Raiser and Mr. Raiser's vehicle suspicious for two main reasons. First, based on his "experience and knowledge of the area," Detective Fealy stated it is "unusual" to find individuals seated in their parked cars in that location.[2] ECF No. 132-2 at 59. According to Detective Fealy, the

---

[2] It is noted that Mr. Raiser raised multiple evidentiary objections. *See, e.g.*, ECF Nos. 165-1, 185-2, 186-2. To the extent that the objected-to evidence is admissible and relied on, the Court overrules the objections. To the extent that the objected-to evidence is not

location where Plaintiff parked is "frequently the setting of criminal activity, including theft from the surrounding agricultural properties, gang graffiti, and littering." Further, Detective Fealy stated that the location is known to be a place where individuals dump stolen vehicles, or where individuals pull off the road to use drugs or alcohol while in the vehicle. *Id.* at 60; *see also* ECF No. 165-8 at 6–7 (Resp. Special Interrog. No. 15). Second, Detective Fealy observed that Mr. Raiser's vehicle was "filled with what appeared to be trash." *See* ECF No. 186-3 at 6; *see also* ECF No. 132-2 at 60, 63–65 (Detective Fealy's Declaration and the supporting photographic evidence of the vehicle as Attachment A). Detective Fealy's observation made him think Mr. Raiser's vehicle was a stolen vehicle "because individuals who steal cars often dump the vehicle along with other items they no longer need." *See* ECF No. 132-2 at 60.

Based on those two reasons, Detective Fealy stated that he suspected Mr. Raiser had committed, was in the process of committing, or was about to commit a criminal offense. *See id.* In the Declaration, Detective Fealy listed possible criminal offenses of: "use of narcotics, theft, trespassing, dumping a stolen vehicle, drug use in public, drinking in public, graffiti, or littering." *Id.*

Detective Fealy thereafter pulled his car near Mr. Raiser. *Id.*; *see also* ECF No. 132-2 at 22. At his deposition, Mr. Raiser stated that he started his car, "attempted to drive off," but then Detective Fealy said to stop the car. ECF No. 132-2 at 22. Shortly

/ / /

---

referenced in this Order, the Court overrules the objections as moot. *See generally Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (discussing how at summary judgment, courts do not focus on the admissibility of the evidence's form but its contents). As just one illustrative example, Detective Fealy's professional experience is highly relevant notwithstanding Mr. Raiser's protests, for it sets the basis for his "reasonable suspicions" as further discussed *infra* pages 19–20 of this Order.

after stopping Mr. Raiser, another officer (who is not a party to this lawsuit) joined Detective Fealy. ECF No. 186-3 at 7 (Defs.' UF No. 20).

Mr. Raiser audio-recorded and transcribed his interactions with Detective Fealy. *Id.* (Defs.' UF No. 21). The Court makes note of some of the interactions that Mr. Raiser transcribed:

Mr. Raiser:      Is it legal to be hear? [sic]

Detective Fealy:      Well its [sic] suspicious over here. We got alot [sic] of drug activity. People come over here…

. . .

Mr. Raiser:      I'm not breaking any laws.

Detective Fealy:      You are loitering around a place you don't need to be loitering around.

Mr. Raiser:      I've got to exist somewhere guy, where do you want me to go?

Detective Fealy:      What's your name boss?

Mr. Raiser:      Do you want my ID.

Detective Fealy:      Yeah, that's fine. Do you have a name?

Mr. Raiser:      Do your background check and let me go.

. . .

Detective Fealy:      So what are you doing here right now?

Mr. Raiser:      Its [sic] a Saturday, I'm just looking for someplace [sic] to hang out. Do some work.

Detective Fealy:      Well, we have alot [sic] of people come out here up to no good.

6

| Mr. Raiser: | [Y]ou guys have got to be aggressive, that's cool, I don't mind you guys do that, I get stopped… |
| --- | --- |
| Detective Fealy: | [Y]ou are in the driver's seat, leaning back… inside the car. I want to make sure the car is not stolen… |

ECF No. 165-6 at 1–2, 4.

As part of the interaction, Detective Fealy went to do a background check based on the driver's license that Mr. Raiser provided, while the other officer stayed with Mr. Raiser. *See* ECF No. 132-2 at 60–61; ECF No. 186-3 at 8–9 (Defs.' UF No. 23); ECF No. 165-6 at 6–10. CLETS data, as presented by Mr. Raiser, indicates that Detective Fealy ran the background check at 7:03 p.m. *See* ECF No. 180 at 13–17. Mr. Raiser, in his Declaration, states that he observed Detective Fealy "appearing to be on his cell phone." ECF No. 165-2 at 8. However, Detective Fealy denied any cellphone use, ECF No. 165-8 at 1–2 (Resp. Special Interrog. No. 1), and Mr. Raiser did not produce any concrete evidence validating his observation. *See* ECF No. 110; ECF No. 180 at 8–11 (inferring cellphone usage only based on time lapses in the CLETS data).

Detective Fealy also took notes in his personal notebook, such as Mr. Raiser's name, identity, and "that I [Detective Fealy] came out here to talk to you [Mr. Raiser] to see what you were up to, your [sic] chillin over here…" ECF No. 165-6 at 10–11. Afterwards, Detective Fealy said the following as he let Mr. Raiser go: "uhh, this is not a rest area, so do your business and whatever you need to do, but, people come over here and do drugs and steal avocodos [sic], [Mr. Raiser flags as inaudible] check out who you are . . . ." *Id.* at 11.

The entire interaction Mr. Raiser had with Detective Fealy lasted about 10 minutes and 14 minutes at most. ECF No. 164-1 at 2 (Pl.'s UF Nos. 1, 2); ECF No. 186-3 at 9–10 (Defs.' UF No. 26). Mr. Raiser does not dispute the fact that both officers were "reasonably friendly" with him. ECF No. 186-3 at 8 (Defs.' UF No. 22).

## 2.    The Second Incident (Detective Murphy)

On August 1, 2017, Mr. Raiser parked his vehicle around Escondido, California. *See* ECF No. 132-2 at 43–45; *see also* ECF No. 165-1 at 13 (representing that he parked his vehicle "under a tree at the corner of Leisure Lane and Old Castle").  The area is a "farm land" with "intermittent houses," where "[a]cross the street is a golf course."  *See* ECF No. 132-2 at 43–45; ECF No. 165-9.  At that time, no other cars were parked around him.  *See* ECF No. 132-2 at 46.

A person, who Mr. Raiser described at his deposition as "probably a neighbor," noticed Mr. Raiser.  *Id.* at 43.  The person "drove by and turned around and drove by again."  *Id.* at 45.  During his deposition, Mr. Raiser further explained that he was "[p]robably bothering the neighbor so [he] took off."  *Id.* at 43.

Detective Murphy, a law enforcement officer of San Diego County for 12 years, was on patrol in and around the area at the time with another officer (who is not a party to this lawsuit).  ECF No. 132-2 at 67.  The two officers received a dispatch in which someone called concerning "a suspicious person" located in Leisure Lane and Old Castle Road.  The dispatch stated that the subject does not live in the area and "reclined his seat and avoided eye contact."  The dispatch also stated that "[t]he vehicle is a White unknown make or model that has broken windows."  *See* ECF No. 132-2 at 84; ECF No. 165-12 at 1.

Detective Murphy responded to the dispatch and call.  *See* ECF No. 132-2 at 68.  Eventually he spotted Mr. Raiser near Gordon Hill Road and Old Castle Lane.  *Id.*  Detective Murphy concluded that Mr. Raiser was the "suspicious person," based on the description of the car that the caller provided ("a white vehicle with what appeared to be 'broken windows'").  *Id.*  Further, Detective Murphy in his Declaration stated that he suspected Mr. Raiser was in the process of committing or planning to commit a criminal offense such as burglary or home theft.  This was because according to Detective

Murphy, he has responded to concerned-citizen calls as a law enforcement officer, and based on that experience, "[he] know[s] that residents of neighborhoods know their communities and often properly identify individuals who are out-of-place and suspicious." *Id.* at 67–68. As an example, Detective Murphy described an experience where a concerned citizen reported a suspicious person from outside of the neighborhood, and based on that report, law enforcement interrupted a residential burglary. *Id.* at 68.

It is disputed what happened immediately after Detective Murphy spotted Mr. Raiser. Mr. Raiser claims that he first noticed Detective Murphy only after Mr. Raiser had already started to pull onto Old Castle from Gordon Hill Road. *See* ECF No. 165-2 at 9. In contrast, Detective Murphy states that "Mr. Raiser saw me and began driving his car so as to avoid me." ECF No. 132-2 at 68. According to his declaration, Detective Murphy detained Mr. Raiser based on the dispatch information received, observations made in responding to the dispatch, and Mr. Raiser's evasive behavior. *Id.*

During the detention, Mr. Raiser provided his driver's license to Detective Murphy, and Detective Murphy conducted the background check. After running the background check, Detective Murphy let Mr. Raiser go. *See* ECF No. 165-11. Before letting Mr. Raiser go, Detective Murphy also commented on the appearance of Mr. Raiser's vehicle. Specifically, Mr. Raiser audio-recorded and transcribed his interactions with Detective Murphy, and his transcript indicates that the following exchange occurred:

> Detective Murphy:  If you lived in a caul-de-sac [sic] in the middle of a suburban area people would still probably call on you given the way your car looks, they can't see into it, like what's going on with this car, it looks bizarre. [Y]ou know what I mean.
>
> Mr. Raiser:  [Y]eah, yeah, yea.

///

Detective Murphy: [Y]ou do that to keep the mosquitos out at night?
If the cops pull you over to detain you for that it
would help if you would explain that.

ECF No. 165-11 at 5.

Mr. Raiser provided inconsistent statements on how long the incident lasted. In responding to Defendants' statements of undisputed material facts, he states: "The entire interaction lasted at least 11 minutes." ECF No. 186-3 at 18 (Defs.' UF No. 45). Yet in his own statement of undisputed material facts, he stated that Detective Murphy "detained Plaintiff for about 8 minutes." ECF No. 164-1 at 3 (Pl.'s UF Nos. 5, 6). Of course, Defendants' position is also inconsistent, since they expressed that they do not dispute Plaintiff's statement on the detainment lasting 8 minutes, but then in their own statement, they stated the detainment lasted 11 minutes. *Compare id.*, *with* ECF No. 186-3 at 18. What the parties do agree, however, is that Mr. Raiser "remained in his car for the entirety of his interaction with Detective Murphy," and that Detective Murphy did not verbally threaten him. ECF No. 186-3 at 18 (Defs.' UF Nos. 46, 47).

### 3. The Third Incident (Detective Rossall)

On March 29, 2018, Mr. Raiser was heading south to Escondido and eventually pulled off, around the west side of the I-15 Freeway. *See* ECF No. 132-2 at 10. He parked "out in the country, no houses, no nothing," where the "[c]losest house" was "maybe a quarter mile away." *Id.* at 11.

Detective Rossall has been a law enforcement officer for San Diego County for 9 years. ECF No. 132-2 at 71. He was on patrol in Escondido that day. ECF No. 186-3 at 20 (Defs.' UF No. 51). And according to his Declaration, at approximately 11:23 a.m. that day, Detective Rossall saw from the freeway Mr. Raiser sitting in his vehicle in the area discussed above. *See* ECF No. 132-2 at 71. Detective Rossall's Declaration further states: "Mr. Raiser's vehicle, though appearing to me to be a relatively new car, seemed

to be damaged and filled with a large quantity of items. With regard to damage, the back two windows appeared to have been broken or otherwise altered. I later learned that the rear two windows were covered by screens. The vehicle was also abnormally full with voluminous, miscellaneous items." *Id.* at 72. Detective Rossall provided a still photo of his body-camera footage, in which he states that the photo accurately reflects what Mr. Raiser's vehicle looked like at the time. *See id.* at 72, 88 (Exhibit G).

Detective Rossall declared he has experience and knowledge of the area where Mr. Raiser parked the vehicle, based on his work as a law enforcement officer. Further, he stated he has extensive experience regarding stolen vehicle recovery, as he has won awards for aiding in the recovery of stolen vehicles. *See id.* at 71–72. According to Detective Rossall, the vehicle's appearance made Detective Rossall suspect that Mr. Raiser was dumping a stolen vehicle, specifically because the car appeared new yet also appeared to have the windows broken, which are considered "typical indications" of stolen vehicles. The vehicle being full "with voluminous, miscellaneous items" gave him further suspicion the vehicle was being dumped, since according to him "[i]ndividuals who steal cars often dump the vehicle along with other items they no longer need." *See id.* at 72. Also, Detective Rossall's Declaration states that the location at issue is "where individuals have previously dumped stolen vehicles," as the place "is secluded and relatively close to the freeway," making it easy for individuals to dump the vehicle to avoid detection and flee. *See id.* Detective Rossall declared that all of these facts, taken together, caused him to suspect that Mr. Raiser was in the process of committing, or planning to commit, a criminal offense such as dumping a stolen vehicle. *See id.*

Ultimately Detective Rossall detained Mr. Raiser for about 2 minutes. *See* ECF No. 164-1 at 3 (Pl.'s UF No. 8); ECF No. 186-3 at 24 (Defs.' UF No. 66). During this time, Mr. Raiser held up his driver's license so that Detective Rossall could read it from where he was standing. ECF No. 165-2 at 11; *see also* ECF No. 165-13 at 2. Detective

Rossall stated that he ran the license plate information without leaving the side of Mr. Raiser's car.  ECF No. 132-2 at 73.  After determining that the vehicle was not stolen, Detective Rossall told Mr. Raiser he was free to leave.  *Id.*

It is undisputed that Mr. Raiser remained seated in his vehicle during the entirety of the interaction with Detective Rossall, and that Detective Rossall did not use any physical force, nor did Detective Rossall make any verbal threats.  *See* ECF No. 186-3 at 24 (Defs.' UF Nos. 68–70).

### 4. Damages

At his deposition, Mr. Raiser described the damages from the three incidents as the "loss of freedom and the accompanying mental, emotional trauma, frustration."  *See* ECF No. 132-2 at 18–19, 41, 52.  According to him, the value of his damages is "priceless." Mr. Raiser does not claim out-of-pocket expenses or medical care costs.  *See id.* at 20, 41, 52.  Mr. Raiser also does not claim he was late for work or lost a job due to the incidents. *See id.* at 52–53.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material when it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The initial burden of establishing the absence of any genuine issues of material fact falls on the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *See id.* at 322–23. / / /

Once the moving party has satisfied its initial burden, the non-moving party cannot rest on the mere allegations or denials of its pleading. The non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The non-moving party may meet this requirement by presenting evidence from which a reasonable jury could find in its favor, viewing the record as a whole, in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221–22 (9th Cir. 1995).

In determining whether there are any genuine issues of material fact, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001) (citation omitted). In addition, cross-motions for summary judgment are decided independently. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## III. DISCUSSION

Even constructing the evidence most favorable to Plaintiff, Defendants are entitled to summary judgment. In each of the three instances, the Detectives had a reasonable basis to conduct a brief, non-intrusive 2- to 14-minute investigatory stop. In the first and third incident, the appearance of Mr. Raiser's vehicle, combined with the location of where the vehicle was parked, gave sufficient basis for reasonable suspicion, especially given the Detectives' experience and familiarity with the area. In the second incident, Detective Murphy was responding to a dispatch call, where the details in the call matched Mr. Raiser and his vehicle. Thus, the second investigatory stop was reasonable given the dispatch. Regarding state law claims, the undisputed facts negate any liability, for Mr. Raiser failed to establish essential elements of the claims such as force, threat, intimidation, or coercion. With no valid state law claims against Detective Rossall, Defendant San Diego County also holds no vicarious liability.

In reaching the above conclusion, the Court has rejected the Defendants' challenge that Mr. Raiser failed to comply with the Chambers Rules in submitting his Separate Statement of Undisputed Facts. The Court finds that any alleged violation was *de minimis*. More importantly, the Court prefers to rule on the merits. *See* Chambers Rules 3 (discussing how the "Separate statements are merely used as an aid to assist the Court in pinpointing the material facts"). *See generally* Fed. R. Civ. P. 1 (discussing that the procedural rules "should be construed, administered . . . to secure the just, speedy, and inexpensive determination of every action and proceeding").

The Court also did not consider Mr. Raiser's litigation history, some cases where he prevailed and some he did not. The Court finds no rationale for Defendants to present Mr. Raiser's long record of lawsuits other than to undermine his credibility, a factual matter that the Court is not in position to consider at summary judgment.

At the same time, it is important to dispel Mr. Raiser's reliance on litigation history as well. Specifically, while he argues that each case showed how officers "unlawfully detained Plaintiff, or worse," ECF No. 165 at 7, many times the opposite was the case. *See, e.g.*, *Raiser v. Los Angeles Cty. Sheriff*, 698 F. App'x 415 (9th Cir. 2017) (affirming the lower court's summary judgment against him); *Raiser v. City of Los Angeles*, No. B255525, 2015 WL 5610411 (Cal. Ct. App. Sept. 24, 2015) (same). At minimum, the litigation history does not allow the Court to generalize in favor of either party.

In addition, while Mr. Raiser argues that this lawsuit is "identical in most ways" to *Raiser v. City of Vista*, No. 3:14-cv-02263-CAB-WVG (S.D. Cal. June 29, 2016), Dkt. No. 58 (the case where he prevailed), the factual circumstances are significantly different. To start, the officers in *Vista* were not responding to a citizen call, which already distinguishes *Vista* from the second incident (further discussed *infra* Section III.A.3 of this Order). The court in *Vista* was also primarily wary of the officers' inference that the parking lot of the shopping center was a "high crime area." *See id.* at 1, 5. The court's

wariness stemmed from the fact that describing an area as such "can easily serve as a proxy for race or ethnicity." *Id.* at 5 n.1 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000)). But as Defendants pointed out concerning the first and third incidents, the Detectives in this lawsuit were not referencing an area as "high crime" based on the area's demography. Instead, it was the isolated, unpopulated nature of the area that drew the officer's suspicion because that is typically where suspects dump their stolen vehicles. *Cf. Montero-Camargo*, 208 F.3d at 1138–39 ("In this case, the 'high crime' area is in an isolated and unpopulated spot in the middle of the desert. Thus, the likelihood of an innocent explanation for the defendants' presence and actions is far less than if the stop took place in a residential or business area."). The suspected offense, inferred from the location of where Plaintiff was at the time and the appearance of the vehicle, was fundamentally different.

### A.    Section 1983 Claims

The Court concludes that none of the incidents amounts to a Section 1983 violation. To prevail on a Section 1983 claim, "a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nevada*, 649 F.3d 1143, 1149 (9th Cir. 2011) (citations omitted). At issue is the first element, in which Mr. Raiser argues the sheriff deputies deprived his right secured by the Fourth Amendment.

But in each incident, there was no deprivation of Fourth Amendment rights. The Court addresses each incident separately because they correspond to different Defendants. However, they all face the same problem. There is no evidence Mr. Raiser can point to which could lead a reasonable fact-finder to conclude that either the officers' suspicions were unreasonable, or that the stops lasted longer or were more intrusive than what was necessary. Ultimately the appearance of Plaintiff's vehicle, combined with the

particular location at which Mr. Raiser was staying, allowed officers to formulate reasonable suspicions. And once the officers apprehended him, the interactions lasting anywhere from 2 minutes to 14 minutes were not unreasonable.

### 1. The Fourth Amendment and *Terry* Stops

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Cortez*, 449 U.S. 411, 417 (1981)). The Fourth Amendment is enforceable against the states by virtue of the Due Process Clause of the Fourteenth Amendment. *Berger v. New York*, 388 U.S. 41, 53 (1967) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)).

The dispute in this matter is whether the Detectives' investigatory stops were reasonable. Investigatory stops (also referred to as "*Terry* stops") are reasonable if (1) the officer had a reasonable suspicion that the person seized was engaged in criminal activity, or other conduct justifying investigation (such as a traffic infraction); and (2) the length and scope of the seizure was reasonable. *See Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit* § 9.21 (2017 ed., last updated Dec. 2020); *see also United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (permitting reasonable suspicion over a person who "is about to commit" a crime as well); *cf. Terry*, 392 U.S. at 23–27; *Arvizu*, 534 U.S. at 273 (discussing reasonable suspicion); *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (discussing scope and length). Ultimately, "'*Terry* accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk' as well." *Gallegos v. City of Los*

/ / /

16

*Angeles*, 308 F.3d 987, 992 (9th Cir. 2002) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000)).

### a. Reasonable Suspicion

"The reasonable-suspicion standard is not a particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). "Although . . . a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (alteration in original) (quoting *Arvizu*, 534 U.S. at 274). *See generally United States v. Sokolow*, 490 U.S. 1, 7–8 (1989) (discussing how the level of objective justification need only be "minimal").

Rather, "to form a reasonable suspicion, an officer must have 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011) (quoting *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)). Accordingly, courts determine whether the defendant officer had a "particularized and objective basis" for suspecting criminal activity. *See Valdes-Vega*, 738 F.3d at 1078 (citations omitted).

In reviewing the officer's reasonable suspicion, courts consider the "totality of the circumstances." *Id.* This presents two implications. First, a plaintiff cannot rely on a "divide-and-conquer analysis" because even though each of the suspect's acts may be innocent in itself, collectively they may amount to warranting further investigation. *See id.* (citations omitted); *see also United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013). Second, officers may "draw on their own experience and specialized training to make inferences . . . about the cumulative information available to them that might well elude an untrained person." *Valdes-Vega*, 738 F.3d at 1078.

/ / /

Of course, this second implication has limits.  The suspicion cannot be based on "broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped."  *United States v. Bravo*, 295 F.3d 1002, 1008 (9th Cir. 2002) (quoting *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002)).  Instead, the officer's experienced and specialized inferences are permissible as long as they are "grounded in objective facts" and "capable of rational explanation."  *Lopez-Soto*, 205 F.3d at 1105.  These facts must have been "available to the officer at the moment of seizure."  *United States v. Smith*, 217 F.3d 746, 749 (9th Cir. 2000) (citing *Terry*, 392 U.S. at 21–22); *cf. Torres v. Purdy*, 267 F. App'x 590, 591–92 (9th Cir. 2008) (discussing how "[plaintiff-appellant's] behavior until the moment of the seizure can be included in the determination of whether reasonable suspicion existed").

### b.    Length and Scope

An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  *Florida v. Royer*, 460 U.S. 491, 500 (1983).  In assessing a reasonable scope and duration of the *Terry* stop, "[t]he critical inquiry is whether the officers 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'"  *See United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)), *as amended* (July 15, 1996).

Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.  *See id*.  At the same time, the question is not whether some other less intrusive alternative was available.  After all, "[a] creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."  *Sharpe*, 470 U.S. at 686–87.  Instead, the

appropriate inquiry is "whether the police acted unreasonably in failing to recognize or to pursue [the other alternative]." *Id.* at 687; *see also United States v. Phillips*, 828 F. App'x 456, 457 (9th Cir. 2020).

Determining the reasonable length and scope of the investigative stop will depend on the facts and circumstances of the case. *Gallegos*, 308 F.3d at 991 (citing *Royer*, 460 U.S. at 500). Courts assess "the totality of the circumstances," i.e., "the situation as a whole." *Id.*

## 2. Application to the First Incident (Detective Fealy)

Applying the *Terry* standard to Detective Fealy's stop, the Court concludes that Detective Fealy has provided "specific, articulable" facts on why his suspicions were justified. These range from the nature of the area where Mr. Raiser parked (in which at one point even Mr. Raiser used terms such as "desolate," "dilapidated" to describe the area) to the undisputed appearance of Mr. Raiser's vehicle. Mr. Raiser's own narrative of events does not alter the conclusion that, when the circumstances are construed as a whole, Detective Fealy's perception of the events justified additional investigation.

Further, the 10- to 14-minute investigatory stop did not last more than what was necessary. Based on common sense and understanding the entire sequence of events as a whole, no reasonable fact-finder could conclude that Detective Fealy's investigatory stop was beyond what was needed to dispel his reasonable suspicions.

### a. Reasonable Suspicion

The Court finds that Detective Fealy had formed a reasonable suspicion to detain Mr. Raiser. Detective Fealy has described in extensive detail the rationale for his suspicion. *See* ECF No. 132-2 at 59–65; ECF No. 165-8 at 6 (Resp. Special Interrog. No. 15). Based on his five years of experience, he personally knew the area as a place where people do all kinds of illegal activities, ranging from dumping stolen vehicles, agriculture theft, and drug use. *Cf. Montero-Camargo*, 208 F.3d at 1138 ("[O]fficers are not

required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (accounting for the "trained officer's experience"). He also described how it is unusual for people to park in that area, and how he became extra vigilant about people parking along roadways because he recently found a subject attempting suicide in his car along the roadway (and how he saved that subject due to his diligence). Further, he connected his observation of the vehicle's unusual appearance with his past experience that stolen vehicles look like Mr. Raiser's vehicle. Finally, Detective Fealy observed how Mr. Raiser started his car as soon as Detective Fealy approached him. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). *See generally United States v. Mattarolo*, 209 F.3d 1153, 1157 (9th Cir. 2000) (considering "the time of night, the neighborhood, and the truck with the crate leaving the construction site, to be sufficient to cause an experienced officer to reasonably conclude that criminal activity might be in progress").

These statements are not post-hoc rationalizations. They are supported by other parts of the record. Two points are worth elaborating further. First, Mr. Raiser's vehicle looks unusual due to the mosquito shields that were applied to the rear windows, and the inside of the vehicle looks different due to it being full of Mr. Raiser's personal belongings. This observation has been supported and corroborated by numerous people (both officers and other drivers, as indicated by the second incident) and is supported by pictures that the officers took at the time. Mr. Raiser provides no evidence for the Court to conclude otherwise.

Second, Mr. Raiser indeed parked alone in a rural, "no houses around per se" area which he described as "dilapidated" and "desolate," with "nobody around to bother." *See* ECF No. 132-2 at 24; ECF No. 186-3 at 2 (Defs.' UF No. 2). That area is also near a

private agricultural property, separated by a gate or fence.[3]  *See* ECF No. 186-3 at 2–3 (Defs.' UF Nos. 4, 7); ECF No. 165-8 at 6 (Resp. Special Interrog. No. 15) (discussing "theft from the agricultural properties located near or on Sterling View").  Indeed, when letting Mr. Raiser go, Detective Fealy informed Mr. Raiser that "people come over here and do drugs and steal avocodos [sic]."  ECF No. 165-6 at 11.

Contrary to Plaintiff's assertions, vehicle checks alone cannot dispel these suspicions.  Common sense indicates that vehicles may be stolen before they become flagged as stolen, or become registered in the system as a problematic vehicle.  *Cf. United States v. Wallace*, 937 F.3d 130, 139–41 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2551 (2020), *reh'g denied*, 140 S. Ct. 2799 (2020).  Thus, even if the initial license plate checks come back clean, it was prudent for the officer to stop the suspect vehicle to make sure that the record in the system matches the officer's actual interaction with the driver.

Ultimately, Mr. Raiser consistently conflates the legality of *his* conduct with the *officer's* prerogative to be reasonably suspicious given the totality of the circumstances. It does not matter that Mr. Raiser was not charged of any crime, or that he had the right to "flee" or otherwise not engage with the officer.  It also matters little whether Mr. Raiser was entitled to have mosquito screens on his vehicle, or whether Mr. Raiser was entitled to park his cars in the area at-issue.  Instead, the operative concern is whether those forms of conduct (which Mr. Raiser had every right to engage in), combined with the surrounding circumstances and the officer's experience, provided a reasonable suspicion

---

[3] While Mr. Raiser challenges the descriptions of "near," "next," or "surrounding," he fails to produce any evidence for the Court to conclude otherwise, only a cabined response that there is nothing indicative of agriculture "in the viewable distance."  This is far from enough for an officer to dispel a suspicion when the suspect is in a vehicle that can easily drive to/from the agricultural property, even if the final spot is not in "viewing distance" from the property.

21

to detain Mr. Raiser.  *See Montero-Camargo*, 208 F.3d at 1130–31 (citing *Sokolow*, 490 U.S. at 10).  Here, Mr. Raiser attempts to dispute every suspicion that Detective Fealy has raised.[4]  However, the Court concludes that there are no genuine disputes as to the facts which, in combination, establish reasonable suspicion to stop Mr. Raiser.

### b.    Length and Scope

The Court also finds that Detective Fealy's investigatory stop did not extend more than what was necessary, both in terms of length, scope, and focus.  *Cf. Haynie v. Cty. of Los Angeles*, 339 F.3d 1071, 1076 (9th Cir. 2003) (discussing how a 25- to 35-minute traffic stop prompted by a citizen's report was reasonable to perform pat down search, to search vehicle, and to interview driver).  As discussed *supra* Section III.A.1.b, the operative standard is whether the seizure lasted longer than necessary to confirm or dispel the suspicion.  *See Rodriguez*, 575 U.S. at 354.  While Defendants rely on *United States v. Turvin*, 517 F.3d 1097, 1101–02 (9th Cir. 2008) to validate their *de minimis* analysis, *Turvin* has little, if any, precedential value in the wake of the Supreme Court decision in *Rodriguez*.[5]  *See United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019) ("As *Turvin*'s reasonableness standard cannot be reconciled with the holding of *Rodriguez*, *Turvin* is no longer binding precedent.").  *Landeros* observed that *Rodriguez* had at least

---

[4] Mr. Raiser also takes great lengths deconstructing every word Detective Fealy said in deciding to stop him, but what Detective Fealy told Mr. Raiser matters very little in the Court's analysis of reasonable suspicion.  An officer need not tell the individual the real reason for the stop.  *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (holding that an officer may lie to the individual about the *Terry* stop's basis); *cf. United States v. Chavez*, No. 1:19-CR-00226-DAD, 2021 WL 75237, at *2 (E.D. Cal. Jan. 8, 2021) ("The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop.").

[5] Defendants' citation to case law from other jurisdictions does not persuade the Court either.  Of note, all of them pre-date *Rodriguez*.

partially abrogated *Turvin*. *Turvin* held that a police officer did not transform a lawful traffic stop into an unlawful one when, without reasonable suspicion, he took a break from writing a traffic citation to ask the driver about a methamphetamine laboratory and obtain the driver's consent to search his truck. *See* 517 F.3d at 1098. *Rodriguez* squarely rejected this conclusion and "requires that a traffic stop may be extended to conduct an investigation into matters other than the original traffic violation only if the officers have reasonable suspicion of an independent offense." 575 U.S. at 357.

But even after declining to consider any durations that are automatically justified, the Court still finds the length and scope of Detective Fealy's stop reasonable. The record indicates that no part of Detective Fealy's interactions went beyond the initial basis for a *Terry* stop. Detective Fealy ran a vehicle check, asked Mr. Raiser as to why he was parked in the area, asked about his identity, ran a background check, and jotted down the events in his notebook. *Cf. Rodriguez*, 575 U.S. at 355 ("Typically [ordinary] inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."). There is no indication that Detective Fealy delayed the stop in order to advance some other independent investigation.

Mr. Raiser submits that Detective Fealy prolonged the stop by being on his cellphone for a minute. Yet the only evidence Mr. Raiser has is his own declaration saying so. *Cf.* ECF No. 132-2 at 8 (discussing in deposition how people's memories are unreliable). No part of Plaintiff's recorded transcript indicates that Detective Fealy was on his cellphone, and no part of the CLETS data discusses Detective Fealy using his cellphone other than Mr. Raiser's conjectures of what *could* have happened based on the CLETS time entries and Mr. Raiser's conclusory remarks on time lapses. *See* ECF No. 180 at 8–11. In fact, Detective Fealy explicitly denied using his cellphone at the time, *see* ECF No. 165-8 at 1–2 (Resp. Special Interrog. No. 1), and even after an extensive

discovery effort, Mr. Raiser was unable to obtain any proof regarding Detective Fealy's cellphone use.  *See* ECF No. 110.

More importantly, this factual dispute is not material.  Even if the Court accepts Mr. Raiser's statement that Detective Fealy was using his cellphone, Plaintiff still failed to establish that Detective Fealy was using his cellphone for a reason extrinsic to the investigatory stop.  This is an "essential element" to Mr. Raiser's argument that the detention was more than necessary, and with no proof that Detective Fealy used his cellphone for non-investigatory purposes, the use of the cellphone itself (for one minute) cannot be grounds to determine that Detective Fealy's conduct was unreasonable.

Mr. Raiser also takes issue with Detective Fealy asking unnecessary questions and jotting down notes.  *See* ECF No. 186-3 at 10–11.  Specifically, Mr. Raiser claims that asking about one's arrest, probation/parole, or warrant record constitutes an unnecessary question.  The Court disagrees.  After all, the reasonable suspicion was grounded in the fact that Mr. Raiser was potentially engaged in criminal activity.  *Cf. Rodriguez*, 575 U.S. at 355 (discussing how inquiries on "whether there are outstanding warrants against the driver" are considered ordinary).  Also, as part of inquiring about Mr. Raiser's identity, it makes sense that Detective Fealy found it necessary to jot down the information he obtained.  Regarding Detective Fealy's question on whether Mr. Raiser smoked, Detective Fealy explicitly mentioned that he saw a cigarette butt and wanted to make sure it was not from Mr. Raiser.  *See* ECF No. 165-6 at 10; *cf. Rodriguez*, 575 U.S. at 357–58 (requiring inquiries to be "independently supported by individualized suspicion").  Further, to the extent that one of Detective Fealy's suspicions of Mr. Raiser concerned drug use in an isolated location, this specific question did not exceed the bounds of reasonable inquiries.

/ / /

### 3. Application to the Second Incident (Detective Murphy)

In the second incident, Detective Murphy was responding to a dispatch, in which the description provided for a suspect matched the profile of Mr. Raiser and his vehicle. The Court concludes that the call from the concerned citizen, by itself, was insufficient to establish reasonable suspicion because the calls vaguely alluded to suspicious behavior without specifically articulating any (potential) illegal activity. At the same time, Detective Murphy clearly had a duty to investigate based on the details of the dispatch, especially given his personal experience and knowledge of local residents providing aid in stopping neighborhood criminal activities. Based upon the information provided by the dispatch and Detective Murphy's independent follow-up observations of Mr. Raiser and his vehicle, an investigatory stop of Mr. Raiser was reasonable. And contrary to Mr. Raiser's assertions, the questions asked by Detective Murphy were cabined to what was necessary—to make sure that Mr. Raiser was not engaged in criminal activity.

#### a. Reasonable Suspicion

The Court finds that Detective Murphy too had formed a reasonable suspicion to detain Mr. Raiser, based on the dispatch from a citizen call and the follow-up investigation. As a starting point, the Court declines to conclude that the call *on its own* provided adequate grounds for reasonable suspicion. To rule on this basis, the call must (1) "exhibit sufficient indicia of reliability," and (2) "provide information on potential illegal activity serious enough to justify a stop." *United States v. Vandergroen*, 964 F.3d 876, 879 (9th Cir. 2020) (citing *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014)).

The first element, reliability, is not necessarily the concern. In determining reliability, courts consider a variety of factors, such as: (1) "whether the tipper is known, rather than anonymous," (2) "whether the tipper reveals the basis of his knowledge," (3) "whether the tipper provides detailed predictive information indicating insider

knowledge," (4) "whether the caller uses a 911 number rather than a non-emergency tip line," and (5) "whether the tipster relays fresh, eyewitness knowledge, rather than stale, second-hand knowledge." *Id.* at 879–80; *see also United States v. Williams*, 846 F.3d 303, 309 (9th Cir. 2016) (discussing similar factors, such as: (1) eyewitness knowledge, (2) whether the police corroborated the tip, (3) whether the caller used the 911 system, and (4) whether the caller reported a specific and potentially ongoing crime).[6]

Most of the factors align in Detective Murphy's favor. The caller was not anonymous.[7] *See* ECF No. 132-2 at 84. The caller was an "insider" too. *See id.* at 67 (commenting on "an individual who was outside of the local area"); ECF No. 165-11 at 2–3. Also, the call was based on eyewitness observation, not relaying a second-hand knowledge. *See, e.g.*, ECF No. 165-12 at 1. And the police were able to corroborate the descriptive tip, since Detective Murphy indeed identified Mr. Raiser as a male, not living in the area, and driving a white vehicle with what could look like broken windows. *See* ECF No. 132-2 at 84; ECF No. 165-12 at 1.

Other factors gravitate towards Mr. Raiser. There is no evidence the call was from a 911 emergency line. And the dispatch records are not descriptive or specific. No part of the transcribed records describes any specific criminal activities, even after there is a specific inquiry on "what the subject is doing that is suspicious." *See* ECF No. 165-12 at 1; *see also* ECF No. 132-2 at 84 (indicating that the Computer Aided Dispatch reports,

---

[6] Mr. Raiser cites to a different *Williams* opinion, 837 F.3d 1016 (9th Cir. 2016), but this opinion was amended and superseded on denial of rehearing *en banc*. The apposite case is the one discussed above, 846 F.3d 303.

[7] While Mr. Raiser protests that the redaction prevents the caller from being "identified or identifiable," this does not raise a genuine issue of material fact. It is evident that there is a specific address and phone number assigned to the caller. *See* ECF No. 132-4 (affirming the veracity of the document and discussing how the redactions are typical).

also referred to as Background Event Chronology, are also silent on any specific criminal activity). While Detective Murphy informed Mr. Raiser at the investigatory stop that "People called me today because they believed you were casing houses," ECF No. 165-11 at 3, there is no additional evidence to support this statement.

Ultimately the Court still concludes that considering the "totality of the circumstances," *Vandergroen*, 964 F.3d at 880; *Williams*, 846 F.3d at 308, the call exhibited sufficient indicia of reliability. Even viewing the evidence in favor of Mr. Raiser, at least five factors (identifiable person, basis, insider knowledge, eyewitness knowledge, and officer corroboration) weigh in favor of Detective Murphy against three (911 emergency line, detailed information, and specific and potentially ongoing crime) which favor Mr. Raiser.

As to the second element, however, the call fails to "provide information on potential illegal activity serious enough to justify a stop." *Vandergroen*, 964 F.3d at 879. Certainly, burglary or home theft is an illegal activity serious enough to justify a stop. *See* Cal. Penal Code § 459 (burglary). But the dispatch record lacks sufficient detail on how any suspicious behavior and the appearance of the car may logically be connected to burglary. "The 'absence of any presumptively unlawful activity' from a tip will render it inadequate to support reasonable suspicion." *Vandergroen*, 964 F.3d at 881. Such is the case here. The only observations made in the call/dispatch is that the person looks suspicious, he reclined his seat and avoided eye contact, and his vehicle has broken windows. ECF No. 165-12 at 1. No part of these direct a fact-finder to conclude that the person at issue will commit burglary. *Cf. United States v. Jackson*, No. 4:19-CR-00010-JD-1, 2020 WL 6047235, at *4 (N.D. Cal. Oct. 13, 2020) (declining to find that the tip informed potentially illegal conduct when the only information provided was that smoke was coming from the car).

/ / /

But finding that the call on its own did not provide reasonable suspicion does not end the matter. "After receiving the information provided by the tipster, the officers would have been delinquent had they not driven over . . . to investigate the situation." *Williams*, 846 F.3d at 310; *accord Williams v. City of Tempe*, No. CV-17-02161-PHX-SMB, 2019 WL 2905091, at *4 (D. Ariz. July 5, 2019), *aff'd sub nom. Williams v. Albertsons Companies LLC*, 822 F. App'x 579 (9th Cir. 2020); *cf. Jackson*, 2020 WL 6047235, at *1 (ruling in favor of the officer regardless of deciding that the phone tip alone did not generate reasonable suspicion); *Haynie*, 339 F.3d at 1075 ("As stated by the district court, '[plaintiff's] detention was lawful because of the suspicion created by the citizen's call.'"). Detective Murphy has specifically declared that, based on his 12 years of experience, he knows that neighborhood residents "often identify individuals who are out-of-place and suspicious." *See* ECF No. 132-2 at 67–68. In fact, Detective Murphy personally experienced an incident in which a citizen report allowed law enforcement to interrupt a residential burglary. *See id.* at 68. Based on his law enforcement experience, his interaction with citizen calls, and his observations, it was reasonable for Detective Murphy to stop a vehicle that matched the descriptions provided in the dispatch.[8]

Mr. Raiser attempts to distinguish between "broken windows" and "appearance" thereof. Observations made by countless other officers confirm that when viewed in passing, the car windows appear to be broken. In fact, Detective Murphy specifically explained that one of the reasons for stopping the vehicle was based on its appearance. *See* ECF No. 165-11 at 5 ("[Y]ou do that to keep the mosquitos out at night? If the cops pull you over to detain you for that it would help if you would explain that."). The case

---

[8] This also explains Detective Murphy's representation that "People called me [Detective Murphy] because they believed you [Mr. Raiser] were casing houses, they thought you were suspicious." ECF No. 165-11 at 3. At worst, whether Detective Murphy was true to his representation or was fabricating the excuse is irrelevant, as discussed *supra* note 4.

provided by Mr. Raiser, *Sialoi v. City of San Diego*, 823 F.3d 1223 (9th Cir. 2016), actually helps the Defendants. Unlike *Sialoi*, it is undisputed that Mr. Raiser stayed in his car and that Detective Murphy did not threaten him. *Cf. id.* at 1231 ("[O]nce the officers discovered that the item in G.S.'s hand was a mere toy, the officers violated clearly established law and acted wholly unreasonably in using extreme force to disrupt a peaceful birthday party for a seven-year-old girl . . . ."). And after dispelling his suspicions, Detective Murphy let Mr. Raiser go. *See* ECF No. 165-11.

### b. Length and Scope

Finally, the Court also concludes that the investigatory stop did not extend beyond what was necessary. *See id.* Mr. Raiser challenges certain questions he finds as being unrelated to Detective Murphy's suspicion. The Court disagrees, as the questions were part of establishing Mr. Raiser's identity (and thus dispel him from being a criminal suspect) and reconciling the appearance of Mr. Raiser's vehicle (which was an important information provided in the dispatch call). Ultimately, there is no evidence that Detective Murphy extended the stop in order to advance some other independent investigation. Accordingly, the Court concludes that there are no genuine issues of material facts on this essential element.

### 4. Application to the Third Incident (Detective Rossall)

Finally, the Court finds that the investigatory stop by Detective Rossall was reasonable. Mr. Raiser does not protest the length and scope of the investigatory stop which lasted a whole 2 minutes. The undisputed factual details indicate that Mr. Raiser remained seated in his vehicle, and Detective Rossall did not use any physical force or make any verbal threats. After the vehicle and license check, Plaintiff was free to go.

Thus, the Court focuses instead on whether Detective Rossall had reasonable suspicion to stop Mr. Raiser in the first place. And for reasons similar to that discussed in the first incident, *supra* Section III.A.2.a, he did. Detective Rossall had nine years of

experience, even winning awards for aiding the recovery of stolen vehicles. *See* ECF No. 132-2 at 71–72; *cf. Michael R.*, 90 F.3d at 346. He had personal knowledge of the location "where individuals have previously dumped stolen vehicles," particularly because the area is "secluded and relatively close to the freeway." ECF No. 132-2 at 72; *cf. Montero-Camargo*, 208 F.3d at 1138 (discussing how "relevant characteristics of a location" could establish reasonable suspicion). Further, he observed that, while the car appeared new, the windows looked broken and the inside was filled with voluminous, miscellaneous items. These features and appearances have been corroborated by multiple evidentiary sources, and Detective Rossall's experience has directed him to identify such features as those of stolen vehicles.

Mr. Raiser argues that Detective Rossall should have run a check against Mr. Raiser's plates which would have dispelled Detective Rossall's suspicion in about 1 or 2 seconds. As further proof that Detective Rossall's actions were unreasonable, Mr. Raiser relies on a video which shows Detective Rossall inputting Plaintiff's license plate number, hitting the enter key prior to getting out of the car and not waiting for the results. However, a record check for the vehicle plate which failed to report a vehicle as stolen would not prove the vehicle was not stolen, given that vehicles may be stolen before they are reported stolen or are identified in the system as stolen.

Mr. Raiser further questions Detective Rossall's credibility and challenges Detective Rossall's ability to observe the things that he reported as to the appearance of Mr. Raiser's vehicle. However, it is undisputed that Mr. Raiser drove a vehicle with mosquito screens placed in the back windows, ECF No. 132-2 at 54–55, that was filled with "stuff" 24/7, *see id.* at 56. These appearances led Detective Rossall, as well as the other officers, to opine that the vehicle's condition appeared to be similar to stolen cars that had been previously encountered.

/ / /

19-cv-0751-GPC-KSC

### B. State Law Claims

Mr. Raiser's state law claims are also not convincing, with sparsely any factual predicate to back the allegations. As a starting matter, his false imprisonment claims are summarily rejected as he is wholly silent on the issue even after Defendants presented reasons why the claim is invalid. Such concession constitutes waiver. *See, e.g.*, *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005); *Abogados v. AT&T, Inc.*, 223 F.3d 932, 937 (9th Cir. 2000). Even on the merits, the factual record shows that Detective Rossall was privileged, that he did not use any force (or threatened to do so), and that Mr. Raiser failed to establish damages, an essential element of the claim.

On claims based on the Bane Act, Mr. Raiser has failed to establish an essential element to the claim, which is that Detective Rossall interfered with Mr. Raiser's rights (or attempted to) "by threat, intimidation, or coercion." *See* Cal. Civ. Code § 52.1. As Section I.B.3 shows, *supra*, it is undisputed that during the 2-minute interaction, there was no physical force or verbal threats. *Cf. Richardson v. City of Antioch*, 722 F. Supp. 2d 1133, 1148 (N.D. Cal. 2010) (granting Bane Act liability because the officers were "kicking in the front door, screaming . . . , roughly handling Plaintiff . . . and using a taser"); *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1289 (9th Cir. 2001) (kicking the plaintiff).

In his brief Mr. Raiser alleges that "Rossall threatened Plaintiff with citation, arrest, detainment and / or jail which all goes hand in hand with disobeying a police order." ECF No. 165 at 29. No part of the transcription can back this claim. *See* ECF No. 165-13. In fact, at deposition Mr. Raiser admitted the following:

Q. Again, Detective Rossall never once told you he would shoot you; is that correct?

A. That's a better way to word it. Yeah, that's accurate.

Q. And he never once told you he would arrest you?

31

A.    Exactly.

Q.    He never once told you he would pull you from the car?

A.    Correct.

Q.    And he never once told you he would handcuff you; correct?

A.    Correct.

ECF No. 132-2 at 18.

The only fact Mr. Raiser can present is that "Rossall was in full police uniform and carried a gun. He was also communicating – by carrying a gun and wearing a police uniform – the threat of enforcing his orders that Plaintiff stop his car." ECF No. 165 at 29. Under Mr. Raiser's interpretation of "violence," every interaction that someone has with an armed police officer would constitute a Bane Act claim. That is not the law. *See Quezada v. City of Los Angeles*, 222 Cal. App. 4th 993, 1008 (2014) ("The coercion inherent in detention is insufficient to show a Bane Act violation."), *as modified* (Jan. 28, 2014); *Shoyoye v. Cty. of Los Angeles*, 203 Cal. App. 4th 947, 960 (2012) (rejecting *Cole v. Doe*, 387 F. Supp. 2d 1084 (N.D. Cal. 2005), and discussing how being "authorized to use force" is insufficient); *see also Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 70 (2015) (affirming *Shoyoye*, and rejecting *Moreno v. Town of Los Gatos*, 267 F. App'x 665 (9th Cir. 2008), as outdated law), *as modified on denial of reh'g* (Mar. 6, 2015).

In sum, no state law claim survives summary judgment. And because Detective Rossall is not liable, there is no basis for vicarious liability against Defendant San Diego County either. *Cf. de Villers v. Cty. of San Diego*, 156 Cal. App. 4th 238, 250 (2007).

## IV.    CONCLUSION

Allegations of officer misconduct directed at the homeless are a serious matter. However, a close inspection of the claims made here show that the allegations of

19-cv-0751-GPC-KSC

misconduct are baseless.[9]  For the reasons discussed above, the Court **GRANTS** Defendants' Motion for Summary Judgment, and **DENIES** Plaintiff's Motion for Summary Judgment.  As none of Plaintiff's claims against Defendants survive summary judgment, the Clerk of Court is **DIRECTED** to close the case.

      **IT IS SO ORDERED.**

Dated:  July 8, 2021

Hon. Gonzalo P. Curiel
United States District Judge

---

[9] Because the Court concludes that Mr. Raiser failed to allege facts sufficient to establish a violation of any constitutional right, "there is no necessity for further inquiries concerning qualified immunity."  *Haynie*, 339 F.3d at 1078 (citation omitted).  However, even if Mr. Raiser had properly alleged constitutional violations, the Court notes that it was not unreasonable for the three Detectives to conclude that their actions did not constitute a violation of Mr. Raiser's rights.  Thus, they would be entitled to qualified immunity.